## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MARYLAND

**ESTATE OF ANTHONY ANDERSON**,     *
SR, et al.

                     *

      Plaintiffs

                     *

      v.

                     *

**TODD STROHMAN, et al.**

                     *      CASE#        1:13-CV-03167-GLR

      Defendants          *
*************************************************************************

### OPPOSITION TO PRE-MATURE MOTION FOR SUMMARY JUDGMENT

    **NOW COMES**, the Estate of Anthony Anderson, by and through its *Personal Representative,* Edith Fletcher, Edith Fletcher in her individual capacity as *Mother of Decedent*, Leon Anderson, *Father of Decedent*, Anthony Anderson, Jr., *Son of Decedent*, Yvonne Anderson, *Daughter of Decedent*, Jean Anderson, *Daughter of Decedent*, Marcus Pettiford, *Son of Decedent*, and Terrence Manocky, *Son of Decedent*, to present this Opposition to Pre-Mature Motion for Summary Judgment pursuant to Rule 56, alleging as true the following:

    I.      **STATEMENT OF FACTS**

    Plaintiff Estate, et al., filed suit against Defendant Gregg Boyd, et al., alleging several state constitutional and federal torts claims for the wrongful death of Anthony Anderson, Sr.  On the 24th day of March, 2014, this Court issued a scheduling order providing that discovery should be completed no later than September 5, 2014.  ECF Doc. 23.  On the 15th day of April, 2014, the parties agreed to amend the scheduling order to extend discovery, *inter alia*, to February 6, 2015.  ECF Docs. 24-25.

1

On the 12th day of January, 2015, the parties filed, and the court granted, a joint motion to extend discovery to the 1st day of June, 2015.  ECF Docs. 41-42.  The Motion summarily stated that the parties have been actively engaged in "[s]ignificant discovery" and the additional time will be used to thoroughly bring discovery to completion.   ECF Doc. 41 ¶1.  Some of the reasons for extending the discovery deadline jointly relied upon by both parties were the facts that:

> 3.      "[U]ndersigned counsel are working in good faith with each other, and the potential witnesses, to coordinate dates, times, and places of depositions; and, at this time, counsel are trying to schedule as many fact witness depositions as possible to take place during the week of February 16, 2015.  Because February 16, 2015 is a holiday (Presidents' Day), undersigned counsel believe it will be a day on which counsel and some witnesses will be available.  Counsel have agreed to be available on February 16.

> 4.      The parties expect that testimony provided by fact witnesses also might be relied upon as part of their respective experts' opinions. Therefore, counsel for Officer Defendants and counsel for Plaintiffs may supplement their Rule 26(a)(2)(B) expert disclosures as additional fact discovery takes place. Counsel also intend to take expert depositions after fact discovery is complete.

Notwithstanding the above adjustments and the reasons therefor, Defendant Gregg Boyd filed a pre-mature Motion for Summary Judgment alleging that: Defendant Boyd is:  (1) exempt from civil prosecution under the doctrine of qualified immunity, (2) not liable for use of excessive force against Anderson, and (3) not liable for kicking [and beating] Anderson thereby causing his fatal injuries.

Plaintiffs oppose Defendant Boyd's Motion legally on the grounds that it is pre-mature, and on factually grounds that follow:

Plaintiff Anthony Anderson, Sr., was a somewhat disabled middle-aged man who could not ambulate very well due to a prior hip injury and problems with his feet.  (Ex. 5, pp. 12 - 13).  On September 21, 2012, @ 4:18 pm, decedent Plaintiff Anderson walked over to the neighborhood

liquor store, OK Liquors, located on the corner of Bradford and Biddle Streets in Baltimore City. *Id*. He intended to purchase a few alcoholic beverages for his wife, Rebecca Billon. *Id*. at 19. Anderson was expecting to meet her later that day at his mother's house, 1208 North Monford Avenue, to imbibe. Anderson arrived at the store safely and without incident. However, on his way back home, he became another victim of a 'homicide by police.'

When decedent Plaintiff Anderson exited the liquor store, he saw some guys he knew from the neighborhood. Plaintiff spoke to one of them for few seconds, exchanged a single loose tobacco filled cigarette, then parted ways. (Ex. 6, p. 20), (Ex. 4, p. 62), (Ex. pp. 8, 24), (Ex. 11, p. 7). Anderson proceeded home in a diagonal northeasterly route where he crossed over Biddle Street onto the adjacent sidewalk. (Ex. 9, pp. 6-7). Then Anderson entered into a 'packed dirt' trail along an empty lot/field between Biddle Street and North Montford Avenue. *Id*. With the exception of the trail, this lot/field was filled with overgrown grasses, trash, weeds, and wild flowers. (Ex. 4, p. 53), (Ex. 2, pp. 9-10), (Ex. 15). Anderson was carrying in his hand a black bag containing his recently purchased alcoholic beverages. (Ex. 4, pp. 110-11), (Ex. 5, pp. 14-15, 20 - 21).

Midway through the field, unbeknownst to Anderson, he was being surreptitiously stalked by Det. Todd Strohman, who had gently alighted from an unmarked Hyundai Sonata in which he was accompanied by Dets. Gregg Boyd and Michael Vodarick. (Ex. 4, pp. 17-18, 110-11), (Ex. 5, pp. 14 - 15, 20 - 21), (Ex. 11, p. 7), (Ex. 8, pp. 20-21, 26-27). Strohman pursued Anderson in a stealth-like manner by lightly trotting behind him, increasing his speed and intensifying his pace with every step to cover substantial ground quickly and avoid detection. (Ex. 9, pp. 6-7, 25-29)(Ex. 2, pp. 9-11), (Ex. 11, p. 7). When he caught up with Anderson, Strohman pounced on him from behind. *Id*. The moment of impact was forceful, violent, sudden and without warning. (Ex. 2, pp. 9-11), (Ex.

3

9 p. 25-29).  In one fluid motion, Strohman had snatched-up and grabbed Anderson from the blind side in what he referred to as a 'reverse "bear-hug"', penning his arms against his waist area so Anderson could not brace himself from the vicious combat maneuver.  *Id.*, *see also* (Ex. 4, p. 53), (Ex. 10, p. 20), (Ex. 11, pp. 5, 7).  In liquid fashion, before Anderson even knew what hit him, Strohman had lifted Anderson off his feet several inches above the ground, and violently slammed him down upon the 'packed dirt' lot head and neck first.   (Ex. 5, pp. 5-6),   (Ex. 2, pp. 9-11). Strohman placed Plaintiff in handcuffs, then searched his pockets with negative results, –i.e., no money nor drugs recovered.  (Ex. 4, pp. 53, 55-56, 71-72), (Ex. 10, p. 20).

Strohman admitted not having any 'reasonable articulable facts' to suggest or believe Anderson was armed and dangerous prior to his use of force as above mentioned.  (Ex. 4, p. 110), (Ex. 8, p. 24).  Nor did Strohman testify that he reasonably believed Anderson posed a threat to officer safety at the time of the stop and subsequent illegal search.  *Id*.

After Anderson was placed in handcuffs, Dets. Strohman, Michael Vodarick, and Gregg Boyd commenced to kick and beat Anderson until he was rendered unconscious.  (Ex. 6, p.16), (Ex. 5, pp. 14-15, 20-21), (Ex. 12, p. 00024), (Ex. 10, pp. 20-21), (Ex. 8, p. 11).  Despite Anderson's painful and agonizing dying declarations to end the torture, Strohman, Vodarick, and Boyd continued to sadistically beat and kick Anderson until the life escaped his narrow frame.  *Id*.  Afterwards, Defendants searched the grassy area on the empty lot which was a well-known CDS stash location for many of the neighborhood drug dealers and 'allegedly' recovered a plastic bag and 'four pills.' (Ex. 6, pp. 18-19), (Keith Johnson __) (Deposition taken Feb. 16, 2015, unavailable by time Opposition was due), (Ex. 14).  At some point modestly after the incident, Fletcher observed the police recover what appeared to have been drugs in the grassy area.  (Ex. 6, pp.  18-19).

4

According to police, three of the pills recovered from the lot/field were described as "clear gel caps", the remaining pill was crushed and described as "suspected heroine." *See* (Ex. 16). Boyd claimed that Plaintiff Anderson spit the clear plastic baggie out of his mouth some time after the attack, however, BPD's DNA analysis report 'ruled-out' Anderson as a DNA contributor to the baggie (Ex. 13); it further noted that the plastic baggie contained the DNA of an unknown male. (Ex. 8, p. 35), (Ex. 13), (Ex. 6, pp. 18-19).

Boyd stated that he recovered the CDS from the ground around Anderson (Ex. 7, pp. 7-8) but did not submit it to Evidence Control. (Ex. 8, p. 40). Boyd also stated that Vodarick did not recover anything from the scene. *Id*. at 38. Interestingly, Strohman stated that *Vodarick* recovered the CDS from the scene and Strohman did not recover anything. (Ex. 4, p. 56). More concerning was the fact that Vodarick's statement was unclear as to who recovered the CDS. (Ex. 1, p. 16). Nevertheless, Vodarick was identified as the officer submitting the CDS to Evidence Control according to the Chain of Custody Report. (Ex. 14). Strangely enough, the Chain of Custody Report identified Vodarick as the recovering officer and stated CDS was not turned-in to Evidence Control until 12:21 am, the following morning. *See Id*. (CDS Chain of Custody Report). The incident was alleged to have occurred at 4:18 pm, however, the Drug Analysis report states the CDS were not recovered until 6:15 pm, 1-2 hours after the incident. (Ex. 14), (Ex. 5, pp. 12-13),(Ex. 8, pp. 19). To this day, none of the officers have ever written an arrest or incident report about the manner in which the CDS was recovered or their encounter with Anderson. All of these things taken together suggest that the CDS was fabricated –or even worse –corruptly manufactured by way of a fraudulent DNA transfer. *Id*.

Later that evening on September 21, 2012, at 9:28 p.m., Edith Fletcher submitted to a very

hostile and obviously 'biased in favor of police' video recorded interrogation session by BPD.  At that time, Fletcher emotionally testified that she was an eye-witness to the entire incident and that she personally observed all "three officers" kick[ing] and beat[ing] her son, Anthony Anderson to death.  (Ex. 6, pp. 13-16).  One month later, she gave this testimony again under similar conditions when the events were still fresh in her mind on October 19, 2012.  At that time, Fletcher submitted to another hostile interrogation session with law enforcement, this time the BPD and State's Attorney's  Office were present.  (Ex. 5, pp. 13-14, 18-21).  There, Fletcher angrily repeated her earlier allegations that "all three officers" kicked, beat and killed her son.  *Id*.

Despite giving two very strong prior consistent statements in 2012 within a month of the incident while the events were still fresh in her mind and her health was reasonably fair, Defendants took Fletcher's deposition on December 19, 2014, when Fletcher's complete memory of the events was obviously impaired by her failing physical and mental health.  At that time, Fletcher advised that she was recently diagnosed with metastatic cancer which had spread throughout her body, that she had been rushed and unable to take her medication, and that her memory of the events was not as good as it was during her prior statement(s) to law enforcement.  *See* (Ex. 3, pp. 87-94).  She further stated that her previous interviews gave a more accurate account of the events of September 21, 2010, than her recollection during deposition.  *Id.*  Fletcher confirmed that she stands by her previous statements given on or about September 21, 2010 and October 19, 2010.  *See  Id.*

Notwithstanding Fletcher's admitted infirmity on December 19, 2014, Defendant Boyd seeks to exploit the same as an opportunity to exonerate himself from Plaintiffs wrongful death claims.  *Id.*  Plaintiffs submit that taking advantage of a 70 year old lady stricken with metastatic breast cancer that has spread to her brain, and who is showing early signs of dementia is not enough to

prevail on a motion for summary judgment. (Shayner Anderson Dep. ___) (Deposition taken Feb. 16, 2015, unavailable by time Opposition was due), (Ex. 3, pp. 5, 17-18, 77).   Based upon the above facts, Defendant Boyd filed a Motion for Summary Judgment.  In opposition thereto, Plaintiffs file this Opposition.

II.    **STANDARD OF REVIEW**

Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, "no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp*., 352 F.3d 896, 899 (4th Cir. 2003).  Thus, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Upon such a showing, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Young v. Prince George's Co.,* 355 F.3d 751, 755 (2004), F.R.Civ.P. 56(e).  In satisfying this burden, the nonmoving party must support the asserted claims with evidence that is significantly probative. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  Plaintiffs submit that they have overwhelmingly satisfied their burden here with "evidence on which a jury might rely. " *Barwick v. Celotex Corp*., 736 F.2d 946, 958–59 (4th Cir. 1984).

III.    **LEGAL ANALYSIS**

A.    **Premature Motion for Summary Judgment**

Rule 56(d) provides in pertinent part: that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Fed.R.Civ.P. 56(d).  Thus, as a general rule, "summary judgment may be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.*" Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1986).  Nonetheless, "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.*" Young v. UPS*, Civil No. DKC–08–2586, 2011 WL 665321, 2011 U.S. Dist. LEXIS 14266 (D. Md. Feb. 14, 2011). Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be "essential to [the] opposition." *Id.* Accordingly, a nonmoving party's request to permit further discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir.1995).

On February 16, 2015, the parties took the depositions on Keith Johnson and Shayner Anderson, two key eye-witnesses in the instant matter.  Keith Johnson stated during his deposition that Anthony Anderson did not purchase or sell drugs at anytime after he exited the OK Liquor store located on the southernmost corner of Biddle and Bradford Streets.  (Keith Johnson __) (Deposition taken Feb. 16, 2015, unavailable by time Opposition was due).  Instead, Johnson unequivocally stated that Anderson had just given a man named "Reds" a loose cigarette. *Id.* Johnson further stated that when police approached from behind in the empty lot they did not identify themselves as police of give any command to "stop." *Id.*

Shayner Anderson testified at her deposition on February 16, 2015, that her mother, Edith Fletcher's health has been rapidly deteriorating ever since she was diagnosed with cancer almost one year ago that had spread from her lungs to her brain.  (Shayner Anderson __) (Deposition taken Feb. 16, 2015, unavailable by time Opposition was due).  Shayner Anderson testified that Fletcher is often confused, forgetful, disoriented, and just generally not doing well.  *Id.*  She stated that Fletcher could barely walk at the time her deposition was taken, she was not cogent in her thoughts, and her ability to recall simple things like where she lives was extremely poor.  *Id.*  Shayner Anderson also testified that Fletcher's mind was sound on September 21, 2012, when she witnessed Defendants Boyd, et al., kill her son, and on October 19, 2012, when she submitted to interrogation by law enforcement.  *Id.*  Shayner Anderson testified that on September 21, 2012, Fletcher had a better vantage point than herself, Anthony Anderson, Jr., and Yvonne Anderson, and could personally see all three of the officers named in the instant suit brutally kicking and beating her son to death.  *Id.*  Shayner Anderson testified that Fletcher screamed at the three officers to stop kicking her son.  *Id.*

However, because Plaintiffs had been advised that Keith Johnson and Shayner Anderson's depositions taken on February 16, 2015, would not be available until March 2, 2015, Plaintiff is unable to provide the court, at least at this juncture, with the customary deposition excerpts.  It is for these reasons, Plaintiffs have not had the opportunity to produce information that is "essential to their opposition."  The discovery deadline is June 1, 2015, --over 90 days away.  Plaintiffs would obviously like to have the opportunity to present the court with a complete arsenal of evidence, so that it may perhaps file its own a Motion for Summary Judgment against Defendant Boyd, et al.

It is for this and other reasons, Plaintiffs submit that Defendant Boyd's pre-mature Motion for Summary Judgment should be respectfully DENIED.  Should the Motion be granted Plaintiffs

reserve the right to file a motion under Rule 60(b).

      B.      **Boyd's Motion for Summary Judgment Lacks Merit**

Defendant Boyd's first argument in support of his motion for summary judgment alleged that judgment should be granted as a matter of law because he did not kick Anderson.  Boyd goes on to argue that based thereupon he enjoys qualified immunity from this action.  Plaintiffs disagree mainly because Boyd ignored the most glaring facts that make him jointly and severally liable for the wrongful death of Plaintiff Anderson.  Boyd *did* kick Anderson, –several times; *and* violated his rights under the Fourth Amendment.  (Ex. 6, p. 16), (Ex. 5, pp. 14-15, 20-21), (Ex. 12) (E. Fletcher Statement), p. 00023-24), (Ex. 10, pp. 20-21), (Ex. 8, p. 11).  For the reasons stated below, Plaintiffs submit that Defendant Boyd's pre-mature Motion for Summary Judgment lacks merit.

Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.  *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled in part, Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir.2011).  The Fourth Circuit recently noted that "Following the Supreme Court's recent decision in *Pearson* [ ], we exercise our discretion to use the two-step procedure of *Saucier* [ ], that asks first whether a constitutional violation occurred and second whether the right violated was clearly established."  *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir.2010) (citations omitted).  "If [an officer] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there."  *Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007).

The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of "seizures effectuated by excessive force."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)

*citing Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir.2006).  Whether an officer has used excessive force is analyzed under a standard of objective reasonableness.  *Scott v. Harris*, 550 U.S. 372, 381 (2007).  Thus, courts determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).

In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed.  *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996).  At the summary judgment stage, once we have viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law.  *Scott*, 550 U.S. at 381 n. 8.  It is in light of these legal principles that the court addresses whether the evidence, viewed in the light most favorable to Plaintiff Anderson, shows that Det. Boyd used objectively 'unreasonable force.'  Again, the constitutional standard that governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person are properly analyzed under the Fourth Amendment's "objective reasonableness" standard . . .  *Graham v. Connor*, 49 U.S. 386, 387 (1989).  A police officer who uses deadly force on a fleeing suspect without "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" violates that suspect's Fourth Amendment rights.  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Id*. at 11.

The objective circumstances of this case are that Anderson was walking in a direction away from police when he was unsuspectingly attacked from behind, body slammed to the ground,

11

handcuffed, illegally searched, beaten and kicked to death by Det. Boyd and his co-Defendants.  (Ex. 6, p.  16), (Ex. 5, pp.  14 - 15, 20 - 21), (Ex. 12) (E. Fletcher, p. 00023-24), (Ex. 8, 11).  Thus, this is a case of 'unprovoked flight', --if flight at all, and virtually all of the Defendants agreed, including Boyd, that neither one of the Detectives had any reason to believe Anderson was a threat to either one of them, or armed and dangerous.  (Ex. 4, p. 110), (Ex. 8, pp. 24-25), *see also Brown v. Texas*, 443 U.S. 47, 52, (1979) ("[.] . . even in a high crime neighborhood unprovoked flight does not invariably lead to reasonable suspicion. . . Like unprovoked flight itself, presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry.").

Boyd's suspicion of Anderson involvement in a 'potential drug crime' was based upon an exchange observed between Anderson and another male outside of the OK Liquor store, where several other people were congregated.  Boyd's brief observation of this exchange took place from a distance of 60-90ft. ["about 20-30 yards"] and lasted mere seconds.  (Ex. 4, pp. 47, 61-62).  Boyd's observation unreasonably led him to believe that Anderson was participating in an illegal  drug transaction.  (Ex. 8, p. 69), *Brown*, at 52.  There was no pre-arrest surveillance or investigation, the other party allegedly involved in the Anderson exchange also walked away; was not pursued; and neither Boyd, Strohman, nor Vodarick have any recollection of other persons in the area engaged in any CDS  transactions on that day.  (Ex. 8, pp. 22, 68-69).

Moreover, Anderson did not flee the exchange with the other male, but at all times alleged, simply walked away in the direction of his home.  Thus, Boyd's personal observation did not of itself provide a reasonable basis for suspecting wrongdoing.  Plaintiffs submit that inferring criminal activity from such evidence reflected no more than an "'inchoate and unparticularized suspicion or

"hunch.'"  *See Terry*, 392 U.S., at 27.  No one alleged to have seen any money exchange hands, indeed, when Anderson was taken into custody and searched, neither money nor drugs were found on his person.  (Ex. 4, p. 72) ("***Q***: . . . *[W]hen you searched him, did you recover anything?  **A**: No.  **Q***: *Nothing at all?  **A**: No.*").  Nothing in the record suggested Anderson had any history of violence that was known to Boyd or his co-Defendants at the time of the stop/arrest.  And neither Boyd, Vodarick, nor Strohman could identify what if any substance Anderson had in his hand before they surreptitiously ran up behind him and slammed him to the ground head and neck first (with his arms pinned to his waistline to avoid bracing himself before hitting the ground).  (Ex. 8, pp. 11, 23), (Ex. 4, pp. 70-71), (Ex. 6, p. 16), (Ex. 5, pp. 14-15, 20-21), (Ex. 12) (E. Fletcher, p. 00023-24).

Critically, as it stands, this case presented nothing to suggest Anderson posed any threat whatsoever to Boyd or any of the officers involved in Anderson's attack and unlawful arrest.  *Henry*, at 532.  The lack of any pre-arrest surveillance or investigation, verbal defiance,  "menacing conduct and no known violent criminal history" suggested that Anderson did not pose a threat.  *Id*.  Neither Boyd, Vodraick nor Strohman were 100% certain of what the small objects were in Anderson's possession at the time of the stop.  (Ex. 8, p. 23), (Ex. 4, pp. 70-71).  They certainly had no reason to believe the objects were a weapon of any kind.  According to Boyd, as far as he knew, the objects could have just as easily could have been "loose cigarettes."  *Id*., at Ex. 8, pp. 23-24.  Boyd's recollection of his pre-investigatory stop/arrest observation was as follows:

> "Q:    [.] . . What did you actually see?
> A:    A hand-to-hand transaction.  Someone placing something else in the hands of another individual.
> Q:    Okay.  You said someone placing something else. Could you see what that something else was from your vantage point?
> A:    No."  (Ex. 8, pp. 23-24).

*       *       *

"Q:     It could have been a transaction of loose cigarettes, correct?
A:      From the time we initially saw him?
Q:      Yes sir.
A:      It could have been." *Id*.

Again, noticeably missing from Boyd, et al.'s observation was the transfer of money.

It was *not* like Boyd, et al., were familiar with Anderson from the neighborhood and had recognized him from any prior arrests or criminal activity.  (Ex. 4, p. 19), (Ex. 8, p. 21).  It was a bright sunny afternoon which would have provided scant, if any, cover to a fleeing or armed suspect. (Ex. 8, pp. 21-22).  In sum, a reasonable officer in these circumstances would have had no grounds to believe that Anderson was armed or dangerous or posed a threat to any of the officers.  *Id.*, see also  (Ex. 4, p. 110) ("*Q: Did you have any reasonable articulable facts that you could rely upon to believe that [Anderson] was armed and dangerous?  A:  No.")*, (Ex. 8, pp. 24-25).  Moreover, based upon the totality of the circumstances, none of the officers involved had any more than at best 'barely enough' evidence to justify an investigatory stop.  *Alabama v. White*, 496 U.S. 325, 330 (1990) (Whatever the factual context, reasonable suspicion is a less demanding standard than the probable cause standard applied to arrests).  Plaintiffs submit that they didn't even have that. And they certainly did not have enough evidence to justify probable cause to make an arrest prior to the forcible 'take-down'.  The investigatory stop of Anderson crossed the line and turned into an unlawful arrest.  *U.S. v. McCoy*, 513 F.3d 405, 416 (4th Cir. 2008).  In the McCoy case, the Supreme Court was quick to point out that:

> "*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), provides police officers with a limited exception to the warrant and probable cause requirements of the Fourth Amendment when there is reasonable suspicion supported by articulable facts that criminal activity is *afoot—not a general warrant to hunt out the "nefarious in*

14

*the mundane" based on hunches, intuition, or stereotypes*."

The Fourth Circuit has held that "[a] *Terry* or investigative stop can cross the line and turn into an arrest ... [if], under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.' " *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001) *quoting Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). This rule reflects an attempt to strike a delicate balance between " 'the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law,' " *Id. quoting Terry v. Ohio*, 392 U.S. 1, 88 (1968), and "the needs of law enforcement officers who constantly place themselves in harm's way." *Id.*

In an effort to strike this balance, the Fourth Circuit has held that "[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *United States v. Crittendon*, 883 F.2d 326, 329 (1989)(emphasis added). As a result, police officers may handcuff a suspect when " 'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.' " *Crittendon*, 883 F.2d at 329 *quoting United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988). They may even draw their weapons under certain circumstances. *United States v. Taylor*, 716 F.2d 701, 708-09 (9th Cir. 1983)

However, Plaintiffs submit that the method of restraint employed in the instant case which consisted of a vicious attack from behind, a violent slam to the ground with Anderson's arms pinned against his waistline to prevent bracing (Ex. 11, pp. 10-12), and Dets. Boyd's, et al.'s incessantly kicking and beating Anderson until he was unconscious, after had been previously subdued and placed in handcuffs, crossed the line and constituted an unlawful arrest (Ex. 5, pp. 13-16, 20). None

15

of the provisos mentioned above authorizing police to hand cuff an individual to maintain the status quo and protect officer safety existed in this case.   When balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion" there can be no doubt that Anderson's rights under the Fourth Amendment were violated.   *See, e.g., United States v. Hensley*, 469 U.S. 221, 228 (1985).   The intrusion was horrendous –death; and the crime, at best, --CDS possession, *see* (CL §5-601, a misdemeanor). Accordingly, Defendant Boyd is not entitled to immunity of any sort, and certainly not entitled to summary judgment for wrongful death claims.

Even if the court were to credit the facts advanced by Boyd, the results would be the same. For example:

According to police, on September 21, 2012, around 'rush-hour' (5:00pm-5:30pm) Boyd, et al., made a left turn from Patterson Avenue onto Biddle Street in an unmarked Hyundai Sonata, and "allegedly" observed, through a crowd of several people "collectively" "congregated" in front of the OK Liquor store, from a distance of 60-90 ft, Anderson engaged in what they "believed" to have been a single hand-to-hand drug transaction with another male.  (Ex. 8, pp. 14, 19, 21), (Ex. 4, pp. 22-23).   After Anderson's alleged encounter, Anderson and the male walked away in separate directions from one another.  (Ex. 8, pp. 58, 61-62).

Although, they were not 100% certain of what was exchanged between Anderson and the male, Boyd, et al., decided to stop and investigate.  (Ex. 8, pp. 23-24, 26-27), (Ex. 4, pp. 62-64). Strohman claims he commanded Anderson to "stop" from the rear-passenger side "while the [unmarked] car was still moving."  (Ex. 4, p. 50).  When the car stopped, Strohman stated that he said ""Hey. Hey. Come here" and identified himself as police."  (Ex. 8, p. 25).  Anderson kept

walking without verbally acknowledging whether he heard any police commands.  At that point, Boyd stated that Anderson began to place small objects into his mouth from a bag recovered from his right pocket but he "could not tell what it was."  *Id*., *see also* (Ex. 7, p. 14).  Plaintiff Anderson, Jr., an eyewitness to the occurrence, who happened to be within earshot of scene, said he did not hear Strohman say anything to Anderson, Sr.,  as he walked across the empty lot.  (Ex. 9, p. 25) ("*I didn't hear them say anything to him or nothing.*").  Keith Johnson, another eyewitness within earshot of the events, also said that he did not hear police say a word to Anderson before they attacked him. (Ex. 11, p. 7).  Apparently, Anderson did not hear the police either because he kept walking.  (Ex. 10, pp. 12-13, 18-19).  Strohman alighted from the vehicle, "sneaked" up behind Anderson and grabbed him slightly below his waistline, pinning his arms against his waist in a reverse bear-hug. (Ex. 5, pp. 5-6), (Ex. 10, pp. 12, 18, 27), (Ex. 9, pp. 6-7).  Strohman then lifted Anderson up off of his feet, and slammed him down to the ground head and neck first. *Id.*

Strohman placed Anderson in handcuffs then searched inside of his pockets with negative results. (Ex. 4, pp. 53, 55-56, 71-72).  No money nor drugs were recovered from Anderson's person. *Id.*  Although, Boyd, and his co-Defendants, deny beating and kicking Anderson so excessively, and so many times that they caused him to suffer massive fatal injuries and death (Ex. 8, p. 55), Edith Fletcher, Anderson's mother, who was an eye witness to the entire account, clearly and succinctly alleged that Boyd, as well as the other two officers involved (i.e., Strohman, and Vodarick), equally participated in causing Anderson's wrongful death.  Specifically, on September 21, 2012, the day of the incident, Fletcher stated the following during a very hostile interrogation session conducted by BPD:

" . . .[T]hen the next thing I know, I saw these three police with these black vests on

17

jump out the car, run to where [Anderson] was, kick him down on the ground.  They tackled him like he was a damn football, and I walked over there and said "What's wrong?  What's wrong?"  Because [Anderson] was just walking.  He wasn't doing anything. . . "  (Ex. 6, p.  16).

One month later on October 19, 2012, during another hostile interrogation session, –this time conducted by BDP and the State's Attorney's Office, Fletcher repeated her prior statements regarding the three officers conduct in more detail:

       FLETCHER:  "Right.  All of them touched my son, all three of them" . . . The one didn't.  The one stayed by the car.  He never came over there to them, but them other three [Strohman, Vodarick and Boyd], I don't care what you do with them.  Put them under the jail.  If it were me you'd put me under there. . . . Those three need to go to jail or something needs to happen to them. (Inaudible). . ."
       DURAND:     Ms. Fletcher I need to back up a little bit.  Okay?  You said the tallest officer –
       FLETCHER:   Right.
       DURAND:     He's the one that grabbed your son?
       FLETCHER:  Right.
       DURAND:     What did the other two officers [Vodarick and Boyd] do?
       FLETCHER:  They're standing there kicking [Anderson].  They was kicking him.
       DURAND:     The other two officers were kicking your son--
       FLETCHER:  Right. Right.  (Ex. 5, pp. 13-14).

               *     *     *

       FLETCHER:  "Yeah, they [Strohman, Vodarick, and Boyd] was kicking him.  One officer tried to get him to sit up, and he set him up and held his leg behind him trying to get him to sit up straight.  (Inaudible) "Oh he said get up nigger. Get up" . . . Yeah he said "Get up nigger because you can sit up.  Ain't nothing wrong with you.  You just don't want to go to jail".  That's what he said to him. (Ex. 5, pp. 14-15) . . .
       DET. TAYLOR:     Was he trying to get up?
       FLETCHER:  No. He was trying to turn over because he said, "You all hurting me."  And he was –at that time, he was trying to turn over, and they –excuse me for saying it, but they *beat* on him so he can't turn over.  Right?  So I said, "What is you doing?" just like that."  *Id*. at 16.

               *     *     *

       GIBLIN:     How many police kicked your son?
       FLETCHER:  All three of them.

GIBLIN:      What part of your son's body were they kicking?
FLETCHER:  They were just kicking him. They was just kicking him.
GIBLIN:      Where were they kicking him? Were they kicking him –
FLETCHER:  On the side. They was kicking him.
GIBLIN:      On the side?
FLETCHER:  Yes.  (Ex. 5, p. 20)

                              *      *      *
GIBLIN:      I understand.  How many times did they kick?
FLETCHER:  They just kept kicking him.
GIBLIN:      For How long?
FLETCHER:  They was trying to make him get up, but he ain't –he couldn't
get up.  He was just laying there.  Like I said the one leg went like that, and I said
"Oh my god." That's when they [grand children] started screaming, the one that just
left.  She said Grandma, dead now.  Daddy dead now, Grandma.  Grandma, he dead.
Let's go Grandma. He dead.  Just look at him. He dead."  (Ex. 5, pp.  20 - 21).

*See also* (Ex. 12) (E. Fletcher pp. 00023-24), (Ex. 8, p. 11).

As it stands, not only did Fletcher state that "all three officers" [Boyd, Vodarick, and

Strohman] viciously beat and kicked her son during the BPD interview on September 21, 2012, she

repeated that 'all three' officers beat and kicked her son during a second interview with BPD and the

State's Attorney on October 19, 2012.  (Ex. 5, pp. 13-16, 20-21).   Boyd confirmed that the only

officers around Anderson were himself, Vodarick and Strohman.  (Ex. 8, p. 11).   In his deposition

regarding who was in attendance at the time Anderson became non-responsive, Boyd stated:

A:      "No.  I don't recall who was there that day, other than who was with me
          specifically.
Q:      Okay. Who was with you?
A:      That was Detective Todd Strohman and Detective Michael Vodarick."  (Ex.
8, p. 11).

Defendant Boyd recently challenged Fletcher's statement accusing Boyd of being involved

with the kicking and beating of her son.  At the time of Fletcher's deposition on December 19, 2014,

she could not recall many of the basic details of the events leading to her son's death.  *See* (Ex. 3,

19

pp. 87-94).  Fletcher forgot to take her medication that morning.  *Id.*  During her deposition, Fletcher couldn't even remember her past or current home address.  (Fletcher 8-10).  Fletcher suffers from metastatic cancer in her chest (Lungs, Breast) that has spread to her brain.  (Shayner Anderson ___) (Deposition taken Feb. 16, 2015, unavailable by time Opposition was due).

Just prior to her deposition Fletcher had undergone chemotherapy, and was showing obvious signs of disorientation, confusion, visible distress, and forgetfulness throughout her testimony. (Shayner Anderson ___) (Deposition unavailable), *see, e.g.*, (Ex. 3, pp. 18, 26-27, 64-66, 77, 82-83). However, as argued above, Fletcher's recollection of the events leading to the death of her son Anthony Anderson was good on September 21, 2012, when it occurred, *see, e.g.,* (Ex. 3, 87-94), and it was good when she submitted to a video recorded interrogation session(s) with the BPD.  *See generally, Id.*  Indeed, Fletcher testified in her December 19, 2014 deposition that her recollection of the events were more reliable on or about October 19, 2012 during her interrogation session with BPD/State's Attorney than it was on December 19, 2014, because of her health condition.  *Id.*

Although Fletcher's prior statements provided twice during the hostile law enforcement interrogation sessions were not depositions, and even though she was able to reasonably explain later in her deposition on cross examination the reasons for the inconsistencies contained in her initial deposition testimony when compared with her prior statement(s) given during her BPD interrogation session(s) closer in time to Anderson's wrongful death, it is instructive to point out how inconsistent deposition testimony is handled by the court.  Basically, substantive changes made to prior deposition testimony is permitted so long as a reason is given for the changes made.  *See Holland v. Cedar Creek Min., Inc.*, 198 F.R.D. 651, 652 (D. WV 2001) (Witness may make changes to his testimony on a material matter between the giving of his deposition and his appearance at trial so

long as he gives a reason for each change made.).  Incidentally, in the case *sub judice*, Fletcher is not attempting to change her deposition testimony *per se.*  She is merely attempting to explain the reasons why testimony provided earlier in her deposition was inconsistent with her prior statements given closer in time to the events in question.  She had corrected the record on the points of inconsistencies before her deposition had even concluded.  (Ex. 3, pp. 87-94).

Throughout the several pages of Fletcher's deposition cited in this Opposition, she identified and explained what the discrepancies were between her initial deposition testimony (two officer kicked Anderson) and her prior statements to BPD and State's Attorney (all three officers kicked Anderson).  *See, e.g.*, (Ex. 3, pp. 40, 72-73), (Ex. 6, 16), (Ex. 5, pp. 14-15, 20-21), (Ex. 12) (E. Fletcher pp. 00023-24), (Ex. 10, pp. 20-21).

Fletcher advised Defendant Boyd's counsel to rely on her testimony from October 19, 2012 [and September 21, 2012 for that matter] rather than her inaccurate initial testimony provided during her December 19, 2014 deposition.  (Ex. 3, pp. 87-94).  She explained that her inability to accurately recall the details of events of September 21, 2012 was due to her memory deficiency.  *Id.*  Fletcher further testified that her inability to accurately recall all of the details of the events of September 21, 2012 was, in part, due to her failing health as a result of cancer which had spread from her breast to her brain.  *See Id.*  (Shayner Anderson ___) (Deposition unavailable by time Opposition was due).

It is for these reasons, Defendant Boyd's Motion for Summary Judgment should be DENIED on the issue of his participation in the kicking, beating and mortally wounding of her son, Anthony Anderson, Sr.  The record has clearly established that Boyd was not a bystander, he was a participant.

C.    **Qualified Immunity**

In response to Defendant's argument that Plaintiffs have failed to raise any constitutional

21

dispute with regard to how Anderson was handled as CDS violation suspect, Plaintiffs submit the arguments below.  Based upon the facts and the law, Defendant Boyd violated Plaintiff Anderson's clearly established Constitutional rights and Boyd had no objectively reasonable belief that either his, Stohman's or Vodarick's actions were lawful.

Given the totality of the circumstances in this case, it was completely unreasonable for purposes of an "investigatory stop" for purposes of investigating a suspected misdemeanor CDS violation to, (1) with or without giving any advance command to "stop", (2) "sneak" up from behind and grab an *unsuspecting* Anderson in a reverse 'bear hug' as he is *walking* with his back turned, (3) simultaneously pin his arms to his side to prevent his ability to brace himself from impending impact, while (4) forcefully lifting Anderson into the air several inches off of his feet, only to (5) violently slam him to the ground head and neck first --all [1 - 4] in one fluid motion.  It is further unreasonable to handcuff and search Anderson's pockets for contraband without probable cause to arrest or a reasonable articulable suspicion to believe that Anderson posed a threat to the officer or others or that he was armed and dangerous.  *See, e.g., Park*, 250 F.3d at 851 ("[i]t is inconceivable, based on the facts as determined by the trial court, that Mr. Park would have felt free to leave after being thrown against the wall, kicked, handcuffed and locked in the patrol car.").  Engaging in this conduct violates a clearly established Fourth Amendment right to be free from unreasonable searches and seizures.  *Id*.  Kicking and beating Anderson clearly violates his constitutional rights.  *Id., see also Young v. Prince George's County*, 355 F.3d 751, 756 (2004) ("We find that genuine issues of material fact exist as to the reasonableness of the force used by Officer Hines once Young was handcuffed.").

Based upon the foregoing, Boyd is not entitled to the qualified immunity defense based upon

his conduct surrounding the in custodial death of Anthony Anderson.

D.     **Excessive Force**

In response to Defendant Boyd's argument that he is not liable to Plaintiffs for excessive force because his conduct was reasonable or because he asserts that he did not kick and/or beat Anderson, Plaintiffs submit the following:

Again, an analysis of excessive force, "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 398 (1989).  It is difficult to imagine the unarmed, unsuspecting Anderson ambulating with his back toward the officers and traveling away from their direction, as a threat to the officers or the public.

After considering the extensive testimony from all the parties, Plaintiffs have clearly presented enough evidence for a factfinder to determine that the force used by the officers was unreasonable and excessive.  The severity of the crime being investigated was minimal.  CDS possession is a misdemeanor under Maryland law and carries a maximum penalty of 4 years incarceration or $25,000 fine.  CL §5-601.  As stated throughout this Opposition, Boyd, et al., made no allegation that Anderson posed a threat to any one of them at the time of the stop.  Last, there was no evidence that Anderson resisted which was arguably a bad stop that turned into an unlawful arrest.

When the question is asked whether or not reasonable police officers, acting under the same or similar circumstances, would have violently slammed Anderson to the ground, handcuffed him, searched his pant pockets, kicked and beat him to death merely because they suspected him of being in possession of CDS, the answer is a resounding "NO!"  Plaintiffs submit that a genuine dispute of

23

material facts exist as to this issue of excessive force, and for this reason, Defendant Boyd's Motion

for Summary Judgment should be respectfully DENIED.

### E.    Record Replete with Evidence Boyd Kicked Anderson

Last, Boyd argued that he did not kick or beat Anderson and that the conduct he engaged did

not result in his death.  Plaintiff disagrees.  The record is replete with evidence that not only Boyd,

but all three officers involved, kicked and beat Anthony Anderson.  Anderson sustained massive

injuries as a result of Boyd and his co-Defendants' conduct.  Anderson suffered broken ribs, on both

sides, and the front and back, contusions to his lungs, a ruptured spleen that caused him to "bleed

out", soft tissue injuries and contusions to his head, neck and shoulders.  (Ex. 20).  Based upon the

constellation of massive internal injuries suffered by Anderson, the Medical Examiner, Dr. Zabiullah

Ali, determined that Anderson died of:

> "**BLUNT FORCE INJURIES OF TORSO** which caused multiple left sided rib
> fractures, left lung contusions, and splenic lacerations, leading to extensive intra-
> abdominal bleeding.  The manner of death **HOMICIDE**."  (Ex. 20).

Defendants Boyd, et al.,  have yet to provide any reasonable explanation as to how Anderson

received his massive injuries while in their custody. Instead, they all, one by one denied causing any

additional trauma to Anderson after he was forcibly slammed to the ground by Stohman.  (Ex. 8, p.

55), (Ex. 4, pp. 82-83).

Conversely, Plaintiffs' experts clearly explained how Anderson received his injuries.  Dr.

Lamont C. Smith, expert in Critical Care and Emergency Medicine determined to a reasonable

degree of medical certainty they were caused by the kicking and beating of Anderson allegedly by

"all three officers" as witnessed by Anderson's mother, Edith Fletcher and others, and not solely as

a result of Strohman's body-slam to the hard ground.  (Exs. 17-19) (Dr. L. Smith, MD's Expert

Report & Suppl.).  Critical Care Nurse, Dianne Miller, RN, BSN, MHA, ACM's expert opinion

echoed Dr. Smith's.  See Ex. 19) (Dianne Miller's Expert Report).  It is for these and other reasons,

Defendant Boyd's Motion for Summary Judgment should be respectfully DENIED.

IV.    **CONCLUSION**

Based upon the foregoing, Defendant Boyd's pre-mature Motion for Summary Judgment

should be respectfully **DENIED**.

Respectfully submitted,

____/s/_____
J. Wyndal Gordon
Fed. Bar #23572
**THE LAW OFFICE OF J. WYNDAL GORDON**
20 South Charles Street, Suite 400
Baltimore, Maryland 21202
410.322.4121 o
410.347.3144 f
jwgaattys@aol.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY**, this _23rd _ day of _Feb_, 2015, that the foregoing Opposition  to Motion for Summary Judgment on behalf of Gregg Boyd only was served upon:

Peter Sheehan
Christopher Jeffires
**WHITEFORD TAYLOR & PRESTON**
Seven Saint Paul Street,
Baltimore, Maryland 21202

____/s/_____
J. Wyndal Gordon

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MARYLAND**

**ESTATE OF ANTHONY ANDERSON**,          *
SR, et al.
                                                              *

      Plaintiffs
                                                              *

      v.
                                                              *

**TODD STROHMAN, et al.**
                                                              *          CASE#          1:13-CV-03167-GLR

      Defendants          *
*************************************************************************

**<u>TABLE OF EXHIBITS</u>**

| Exh# | Exhibit |
|------|---------|
| 1. | Det. Michael Vodarick Statement (Sep. 21, 2012) |
| 2. | Anthony Anderson Statement (Sep. 21, 2012) |
| 3. | Edith Fletcher Deposition (Dec. 19, 2014) |
| 4. | Det. Todd Strohman Deposition (Dec. 10, 2014) |
| 5. | Edith Fletcher Statement (Oct. 19, 2012) |
| 6. | Edith Fletcher Statement (Sep. 21, 2012) |
| 7. | Det. Gregg Boyd Statement (Sep. 21, 2012) |
| 8. | Det. Gregg Boyd Deposition (Dec. 10, 2014) |
| 9. | Anthony Anderson, Jr. Statement (Oct. 19, 2012) |
| 10. | Keith Johnson Statement (Sep. 21, 2012) |
| 11. | Keith Johnson Statement (Sep. 22, 2012) |
| 12. | BPD Witness Statement (Edith Fletcher) |

13.             DNA Report

14.             Drug Analysis/Chain of Custody Report

15.             Photograph of Lot (Biddle & North Montford Ave.)

16.             Photographs of CDS "allegedly" Recovered from Lot

17.             Lamont C. Smith, MD's Supplemental Expert Opinion

18.             Lamont C. Smith, MD's Original Expert Opinion

19.             Dianne Miller, RN, BSN, MHA, ACM's Expert Opinion

20.             Medical Examiner's Report

**NOTE WELL:**

Keith Johnson Deposition taken Feb. 16, 2015 (unavailable by time Opposition Due)

Shayner Anderson Deposition taken Feb. 16, 2015 (unavailable by time Opposition Due)