IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ESTATE OF ANTHONY ANDERSON,        :
SR., et al.,
                                   :
     Plaintiffs,
                                   :
v.                                      Civil Action No. GLR-13-3167
                                   :
TODD STROHMAN, et al.,
                                   :
     Defendants.
                                   :

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Plaintiffs', the Estate of Anthony Anderson, Sr. (the "Estate") and Anderson's seven surviving immediate family members,[1] Motion for Leave to Amend Complaint (ECF No. 91) and Motion for Summary Judgment (ECF No. 77). Also pending before the Court are three Motions filed by Defendants, Officers Todd Strohman and Michael Vodarick (collectively, the "Officers"): (1) Motion in Limine to Exclude Certain Opinions of Plaintiffs' Medical Experts (ECF No. 78); (2) Motion for Partial Summary Judgment on the Issue of Whether Alleged Kicking Contributed to the Death of Anthony Anderson (ECF No. 79); and (3) Motion for Partial Summary Judgment on Any Claim for Alleged Deprivation of Medical Care (ECF No. 80). All Motions are now ripe for disposition. Having reviewed the

---

[1] The "Family-Member Plaintiffs" include Anderson's mother, Edith Fletcher; father, Leon Anderson; three sons, Anthony Anderson, Jr., Marcus Pettiford, and Terrence Manocky; and two daughters, Yvonne and Jean Anderson.

Motions and supporting documents, the Court finds no hearing necessary.  See Local Rule 105.6 (D.Md. 2016).  For the reasons outlined below, the Court will grant in part and deny in part Plaintiffs' Motion for Leave to Amend Complaint, deny Plaintiffs' Motion for Summary Judgment, and grant the Officers' Motions.

## I.    BACKGROUND

Around 6:00 p.m. on September 21, 2012, Anderson walked to a neighborhood liquor store in East Baltimore to purchase alcoholic beverages for his wife.  Approximately one hour and a half later, Anderson was pronounced dead at Johns Hopkins Hospital ("JHH").  The parties offer utterly conflicting accounts of what transpired between Anderson's trip to the liquor store and his tragic demise.

According to Plaintiffs, when Anderson exited the liquor store, he spoke to some acquaintances from his neighborhood and exchanged a tobacco-filled cigarette.  Anderson then proceeded home, walking across a dirt trail on a vacant lot between Biddle Street and North Montford Avenue.  Unbeknownst to Anderson, the Officers, who were patrolling the area in an unmarked vehicle, had exited their vehicle and begun following him down the trail. Without announcing his presence or issuing any orders, Officer Strohman grabbed Anderson from behind and placed him in a bear hug, pinning Anderson's arms to his sides.  Officer Strohman

then lifted Anderson two feet in the air and violently slammed him to the ground head and neck first. Officer Strohman landed on top of Anderson, and Anderson, immobilized by the bear hug, was unable to brace himself for the impact with the ground. While Anderson was still on the ground, Officer Strohman placed handcuffs on him. The Officers then repeatedly kicked Anderson until he was unconscious.

According to the Officers, they were patrolling the area near the liquor store because it was a high-crime area known for illicit drug activity. The Officers observed Anderson engaging in what they believed to be a controlled dangerous substance ("CDS") transaction. When Anderson saw the Officers, he began walking away from the liquor store. Officer Strohman then identified himself as a police officer and ordered Anderson to stop, but Anderson ignored him and continued walking away, quickening his pace. Officer Strohman exited the unmarked police vehicle and again ordered Anderson to stop. This time, Anderson turned around to look at Officer Strohman, then turned back around and, while continuing to walk away at a brisk pace, pulled a plastic baggie from his pocket and began ingesting what the Officers believed to be CDS. To prevent Anderson from destroying evidence and potentially overdosing himself, Officer Strohman came up from behind Anderson and bear-hugged him to prevent him from ingesting the suspected CDS. Anderson briefly

struggled by widening his stance, at which point Officer Strohman leaned back to get Anderson off balance and the two fell to the ground.[2]   Officer Strohman then handcuffed Anderson and sat him upright.   The Officers deny kicking Anderson at any point during their interaction.[3]   When Anderson began to look ill, the Officers called an ambulance.

Paramedics eventually arrived on the scene and transported Anderson to JHH where medical personnel determined that his spleen had been severely ruptured and a large amount of blood was pooling in his abdomen.   Anderson was pronounced dead at approximately 7:30pm.   The Medical Examiner ruled Anderson's manner of death as "homicide" and his cause of death as "blunt force injuries of torso."   (Mot. in Lim. Ex. D, at 1, ECF No. 78-6).   A toxicology report conducted after Anderson's death revealed that he had 100 mcg/L of free morphine in his system. (Id. Ex. E, at 1, ECF No. 78-7).   The Officers contend this indicates Anderson had ingested heroine, while Plaintiffs maintain this could indicate Anderson had merely ingested over-the-counter pain relievers.

---

[2] Though the manner in which Officer Strohman took Anderson to the ground is disputed, for ease of reference, the Court will refer to this act as the "Takedown."

[3] The Officers concede, however, that when Anderson was sitting on the ground in handcuffs, Officer Vodarick may have tapped Anderson with his foot to get his attention.   (See Vodarick Dep. 61:7–15, June 4, 2015, ECF No. 77-13); (Vodarick Dep. 48:7–8, June 4, 2015, ECF No. 78-3); (Strohman Dep. 83:2–6, Dec. 10, 2014, ECF No. 78-4).

Plaintiffs initiated this action on October 24, 2013, raising, among other claims, survivor and wrongful death claims under federal and state law and seeking $20 million in damages. (ECF No. 1).   In addition to Officers Strohman and Vodarick, Plaintiffs sued Officer Gregg Boyd, the Mayor and City Council of Baltimore, and the Baltimore Police Department ("BPD"). (Id.).   The Court dismissed the Mayor and City Council of Baltimore and Officer Boyd on March 19, 2014 and May 11, 2015, respectively.   (ECF Nos. 22, 52).   Only two claims remain against the BPD: 42 U.S.C. § 1983 (2012) survivor and wrongful death claims for excessive use of force during and after Anderson's arrest (Counts XXXIV, XXXVI).   The Court stayed these claims on June 19, 2014 pending the resolution of the claims against the Officers.   (ECF No. 35).

The following claims remain against the Officers: (1) a survivor claim by the Estate for violations of Articles 24 and 26 of the Maryland Declaration of Rights (Counts I, II); (2) wrongful death claims by the Family-Member Plaintiffs for violations of Articles 24 and 26 of the Maryland Declaration of Rights (Counts V, VI, IX, X, XIII, XIV, XVII, XVIII, XXI, XXII, XXV, XXVI, XXIX, and XXX); (3) a § 1983 survivor claim by the Estate for violations of Anderson's federal constitutional rights (Count XXXIII); (4) a wrongful death claim by the Family-Member Plaintiffs for common law battery (Count XXXVII); and a

(5) survivor claim by the Estate for common law battery (Count XXXIX).

On January 18, 2016, Plaintiffs filed a Motion for Summary Judgment (ECF No. 77).  On January 19, 2016, the Officers filed a Motion in Limine to Exclude Certain Opinions of Plaintiffs' Medical Experts (ECF No. 78), Motion for Partial Summary Judgment on the Issue of Whether Alleged Kicking Contributed to the Death of Anthony Anderson (ECF No. 79), and Motion for Partial Summary Judgment on any Claim for Alleged Deprivation of Medical Care (ECF No. 80).  Plaintiffs filed Oppositions to the Officers' Motions on February 23, 2016 (ECF Nos. 85, 86).  On this same date, the Officers submitted an Opposition to the Plaintiffs' Motion for Summary Judgment (ECF No. 84), to which Plaintiffs filed a Reply on March 11, 2016 (ECF No. 89).  Also on March 11, 2016, the Officers filed a Consolidated Reply in Further Support of their Motions (ECF No. 88).  Plaintiffs filed a Motion for Leave to Amend Complaint on April 11, 2016 (ECF No. 91).  The Officers filed an Opposition on April 28, 2016 (ECF No. 92), and Plaintiffs submitted a Reply on May 16, 2016 (ECF No. 93).

## II.  DISCUSSION

## A.  Plaintiffs' Motion for Leave to Amend

In their Complaint, Plaintiffs present no allegations regarding the Officers' interactions with the paramedics who

6

responded to the scene of Anderson's arrest or the medical personnel at JHH who treated Anderson. Nevertheless, Plaintiffs now maintain that the Officers intentionally misrepresented that Anderson was suffering from a suspected drug overdose rather than an assault and interfered with the paramedics' ability to assess and treat Anderson by initially refusing to remove his handcuffs. Plaintiffs further contend that the Officers' misrepresentations and interference caused or substantially contributed to Anderson's death. Plaintiffs move for leave to amend their Complaint by adding these allegations. They also request leave to add allegations of § 1983 bystander liability and substitute Shayner Anderson for Edith Fletcher as the personal representative of Anderson's estate.

According to the Scheduling Order, the deadline for moving to amend the pleadings was June 8, 2014—over two years ago. (See ECF Nos. 24, 28). Because Plaintiffs have moved to amend their Complaint after this deadline, they have the burden of satisfying a two-prong test. Odyssey Travel Ctr., Inc. v. RO Cruises, Inc., 262 F.Supp.2d 618, 631 (D.Md. 2003). The first prong is Federal Rule of Civil Procedure 16(b)(4), which provides that "[a] schedule may be modified only for good cause and with the judge's consent." Id. "[A] court's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril[.]'"

Rassoull v. Maximus, Inc., 209 F.R.D. 372, 374 (D.Md. 2002) (quoting Potomac Elec. Power Co. v. Elec. Motor Supply, Inc., 190 F.R.D. 372, 375-76 (D.Md. 1999)). Thus, the good cause analysis under Rule 16(b)(4) is "less concerned with the substance of the proposed amendment" and more concerned with "the timeliness of the amendment and the reasons for its tardy submission." Id. at 373-74. Indeed, "[t]he primary consideration of the Rule 16(b) 'good cause' standard is the diligence of the movant." Id. at 374. "Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'" Id. (quoting W.Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc., 200 F.R.D. 564, 567 (S.D.W.Va. 2001)). If a party was not diligent in seeking to modify the scheduling order, "the inquiry should end." Id. (quoting Marcum v. Zimmer, 163 F.R.D. 250, 254 (S.D.W.Va. 1995)).

There is good cause for amending a complaint after the scheduling order deadline when "at least some of the evidence needed for a plaintiff to prove his or her claim did not come to light until after the amendment deadline." Tawwaab v. Va. Linen Serv., Inc., 729 F.Supp.2d 757, 768 (D.Md. 2010). The Court may consider the following factors when determining whether there is good cause: "danger of prejudice to the non-moving party, the length of delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant

acted in good faith." Id. at 768-69 (quoting Rothenberg v. Marriott Int'l, Inc., No. CCB-08-173, 2008 WL 687033, at *1 (D.Md. Feb. 29, 2008)).

Once a plaintiff has demonstrated good cause for an untimely amendment, the plaintiff then bears the burden of satisfying the second prong: Rule 15(a). Odyssey, 262 F.Supp.2d at 631. Under this Rule, "[t]he court should freely give leave [to amend a complaint] when justice so requires." Fed.R.Civ.P. 15(a)(2). Although the Federal Rules favor granting leave to amend, the decision lies within the sound discretion of the district court. Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va., 985 F.2d 164, 167-68 (4th Cir. 1993) (citing Nat'l Bank v. Pearson, 863 F.2d 322, 327 (4th Cir. 1988)). Leave to amend is properly denied when amendment would prejudice the opposing party, the moving party has exhibited bad faith, or amendment would be futile. Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 446 (4th Cir. 2001) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999)).

The Officers consent to substituting Shayner Anderson as the personal representative of the Estate, recognizing it is appropriate to do so because Edith Fletcher passed away in August 2015. Finding good cause and no prejudice to the Officers, bad faith, or futility, the Court will grant

Plaintiffs' Motion as it pertains to substituting Shayner Anderson for Edith Fletcher.

The Officers oppose Plaintiffs' request to add allegations of failure to provide medical care and bystander liability. In their Reply, Plaintiffs argue there is good cause for their proposed amendment because the facts concerning the Officers' alleged misrepresentations to and interference with the paramedics did not "fully materialize" until Plaintiffs deposed paramedic Lenore Scharf.[4]   (Reply to Mot. for Leave to Amend Compl. at 6, ECF No. 93).   But, Plaintiffs deposed Scharf on September 11, 2015—seven months before Plaintiffs moved for leave to amend.   (Scharf Dep., Sept. 11, 2015, ECF No. 77-12). And, what is more, Plaintiffs knew as early as February 2015 that the Officers told the paramedics that the Officers suspected Anderson was suffering from a drug overdose.   (Narrett Dep. 11:13-21, Feb. 16, 2015, ECF No. 78-12).

---

[4] The Court highlights that in Plaintiffs' opening brief in support of their Motion for Leave to Amend, Plaintiffs neglect to address Rule 16(b)(4)'s good cause standard, merely arguing that leave to amend is warranted under Rule 15(a) and asserting that the proposed amendments will allow them to "clear up any ambiguity concerning [their] claims . . . and to ensure that their pleading conforms to the evidence."   (Mot. for Leave to Amend at 3-4, ECF No. 91).   Plaintiffs did not address the good cause standard until their Reply—after the Officers in their Opposition explained that Plaintiffs are required to show good cause before demonstrating that Rule 15(a) is satisfied.

Plaintiffs seek leave to allege that the Officers are liable for excessive use of force under a bystander liability theory because they "took turns standing around Decedent Anderson while they kicked and beat him unconscious." (Proposed First Am. Compl. ¶ 255, ECF No. 91-3). Plaintiffs, however, knew about facts supporting bystander liability at least as early as December 19, 2014—nearly one and a half years before Plaintiffs moved for leave to amend—when Edith Fletcher testified that the Officers kicked Anderson while he was on the ground. (Fletcher Dep. 73:11–75:3, Dec. 19, 2014, ECF No. 77-3).

Plaintiffs do not identify any reason that prevented them from moving to amend their Complaint months ago. Rather, Plaintiffs explain that they did not think amendment was necessary because they were relying on the general notion that a court should liberally allow amended pleadings at all stages of litigation. Plaintiffs assert that "given the nature of the instant litigation," they "decided to err on the side of caution and amend" because they "did not want to leave anything to chance." (Reply to Mot. for Leave to Amend Compl. at 9).

Considering that Plaintiffs knew about the majority of their proposed allegations at least a year before they moved for leave to amend and nothing prevented them from moving to amend months, or even years, ago, the Court finds Plaintiffs have not

11

acted with diligence.  Moreover, as explained below, this lack of diligence has already prejudiced the Officers and permitting Plaintiffs to amend would further prejudice the Officers.

Plaintiffs argue there would be no prejudice to the Officers because the Officers have moved for partial summary judgment on Plaintiffs' claims for bystander liability and deprivation of medical care.  (See ECF Nos. 79, 80).  But, Plaintiffs fail to recognize that developing facts and claims during discovery that were completely foreign to their Complaint and lacking diligence in moving to amend their Complaint has already prejudiced the Officers by forcing them to move for partial summary judgment in attempt to mitigate the uncertainty regarding the claims that Plaintiffs would pursue.

Plaintiffs next contend there would be no prejudice to the Officers because their proposed amendments are "subtle"—they merely "clarify" their pre-existing § 1983 claims.  (Reply to Mot. for Leave to Amend Compl. at 3, 4).  The Court disagrees and rejects this characterization.  To be sure, § 1983 is the proper vehicle through which to pursue claims for excessive use of force during an arrest and deprivation of medical care.  See Martin v. Gentile, 849 F.2d 863, 865 (4th Cir. 1988). Plaintiffs, however, take for granted the exceptional breadth of § 1983, which permits plaintiffs to sue for alleged violations of any rights secured by the Constitution and laws of the United

12

States.  42 U.S.C. § 1983.  The Court examines § 1983 claims for excessive use of force under a completely different standard than § 1983 claims for deprivation of medical care.  See Graham v. Connor, 490 U.S. 386, 397 (1989) (explaining that § 1983 claims for excessive use of force during an arrest are properly asserted under the Fourth Amendment and require a court to examine whether an officer's conduct was "objectively reasonable" under the circumstances); Martin, 849 F.2d at 871 (explaining that § 1983 claims for deprivation of medical care are properly asserted under the Due Process Clause of the Fourteenth Amendment and require a Court to examine whether there was a "deliberate indifference to serious medical needs").  Because the discovery deadline has passed, permitting Plaintiffs to add a claim for deprivation of medical care at this juncture would prejudice the Officers by denying them an opportunity to discover the facts necessary to develop their defense.

Plaintiffs also argue there would be no prejudice to the Officers because the Officers have been on notice of Plaintiffs' claims for bystander liability and deprivation of medical care since January 2016 when Plaintiffs moved for summary judgment on these claims.  Plaintiffs overlook, however, that January 2016 was several months after the close of discovery, meaning the Officers had no opportunity, at that time, to pursue and develop facts enabling them to oppose these claims.

13

Thus, because Plaintiffs were not diligent in moving to amend, Plaintiffs' lack of diligence has already prejudiced the Officers, and permitting Plaintiffs to amend would further prejudice the Officers, the Court finds Plaintiffs fail to show good cause for adding claims to their Complaint.   Accordingly, the Court will grant in part and deny in part Plaintiffs' Motion for Leave to Amend.

**B.   Officers' Motion in Limine**

**1.   Standard for Admissible Expert Testimony**

The Officers move to exclude several opinions rendered by Plaintiffs' medical experts.   Under Federal Rule of Evidence 702, before a witness can offer expert testimony, he must be qualified as an expert "by knowledge, skill, experience, training, or education."   Fed.R.Evid. 702.   "The fact that a proposed witness is an expert in one area, does not _ipso facto_ qualify him to testify as an expert in all related areas."   Shreve v. Sears, Roebuck & Co., 166 F.Supp.2d 378, 391 (D.Md. 2001); see Gayton v. McCoy, 593 F.3d 610, 617 (7th Cir. 2010) ("[S]imply because a doctor has a medical degree does not make him qualified to opine on all medical subjects.").   Similarly, "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise."   Young v. Swiney, 23 F.Supp.3d 596, 611 (D.Md. 2014); see Steele v. Kenner, 129 F.App'x 777, 781 (4th Cir. 2005) (concluding that

14

district court did not abuse its discretion in finding neurologist was not qualified to offer expert opinion in field of neuropsychology because neurologist would have been "outside his area of expertise"); see also Jackson v. United States, No. 5:08-03876-MBS, 2010 WL 2228378, at *7 (D.S.C. May 28, 2010) (concluding that neuropsychologist was not qualified to testify as to the standard of care for pediatricians). Also, "[w]hile the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact," Shreve, 166 F.Supp.2d at 392, an expert's opinion is relevant "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion," id. at 393 (quoting Ancho v. Pentek Corp., 157 F.3d 512, 518 (7th Cir. 1998)).

Under Rule 702, a witness who has been qualified as an expert may testify in the form of an opinion if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data" and "is the product of reliable principles and methods, and (3) "the expert has reliably applied the principles and methods to the facts of the case." Helpfulness to the trier of fact is the "touchstone" of Rule 702. Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993) (quoting Friendship Heights Assocs. v. Koubek, 785 F.2d 1154, 1159 (4th

15

Cir. 1986)).  Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."  Id. (citing Persinger v. Norfolk & W. Ry. Co., 920 F.2d 1185, 1188 (4th Cir. 1990)).  While the admission of expert testimony concerning everyday matters is usually harmless, the Court must ensure that an expert's evaluation of the commonplace does not "supplant a jury's independent exercise of common sense." Id. (quoting Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986)).

To be admissible, expert opinions must be relevant and reliable.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999) (extending rule in Daubert to all expert testimony).  An expert opinion is relevant when it "is sufficiently tied to the facts of the case."  MCI Commc'ns Servs., Inc. v. Am. Infrastructure-MD, Inc., No. GLR-11-3767, 2013 WL 4086401, at *3 (D.Md. Aug. 12, 2013) (quoting Daubert, 509 U.S. at 591).  To be reliable, an "expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods."  Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).  "Reliability of specialized knowledge and methods for applying it to various circumstances may be indicated by testing, peer review, evaluation of rates of error,

and general acceptability." Id. Regardless of the factors a court reviews when determining whether an expert opinion is reliable, the court must "ensure that 'an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Young, 23 F.Supp.3d at 611 (quoting Kumho Tire, 526 U.S. at 152). Indeed, the Court "should meticulously focus on the expert's principles and methodology." Id. (quoting McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004)).

The party offering the expert witness has the burden of showing, by a preponderance of the evidence, that the expert's testimony is admissible. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). The Court has "broad discretion" in determining whether expert testimony is admissible. Shreve, 166 F.Supp.2d at 391 (citing Cooper, 259 F.3d at 199–200).

**2. Analysis**

The Officers contend the following opinions rendered by Plaintiffs' experts Lamont Smith, M.D. ("Dr. Smith") and Dianne Miller, RN ("Miller") are inadmissible as a matter of law: (1) Anderson's ruptured spleen could not have been caused by only the Takedown; (2) the Officers misled the paramedics; and (3)

misleading the paramedics contributed to Anderson's death.  The Court will review these opinions in turn.[5]

### i.  The Etiology[6] of Anderson's Ruptured Spleen

In his expert report, Dr. Smith opined that "the assault(s) which caused the injuries that led to . . . Anderson's death were so severe that they could have neither been caused by a single fall to the ground nor a slam to the ground during a take-down by one of the [Officers]."   (Mot. in Lim. Ex. O, at 1, ECF No. 78-17).  He further opined that "Anderson most likely suffered a forceful assault—or assaults—to his torso in addition to the impact created by being taken down by the [O]fficers." (Id. at 4).  Dr. Smith also testified that Anderson's injuries were "very consistent with multiple trauma" and the Takedown alone "would not have caused [Anderson's] injuries."   (Smith Dep. 16:15-21, 42:19-43:1, June 19, 2015, ECF No. 78-18).  He

---

[5] The Court recognizes the second and third opinions in the preceding list relate to a claim for deprivation of medical care.  Although the Court will deny Plaintiffs' Motion for leave to add such a claim to their Complaint, the Court will nevertheless determine whether these opinions are admissible because they are relevant to the Officers' Motion for Partial Summary Judgment on any Claim for Alleged Deprivation of Medical Care.

[6] Etiology is "the study or theory of the factors that cause disease and the method of their introduction to the host; the causes or origin of a disease or disorder."   Clarke v. Schofield, 632 F.Supp.2d 1350, 1355 (M.D.Ga. 2009) (quoting Dorland's Illustrated Medical Dictionary, at 627 (29th ed. 2000)).

further testified that it was "[l]ikely" that Anderson was punched or kicked repeatedly. (Id. at 53:3-6).

The Officers argue Dr. Smith is not qualified to render these opinions because he has no experience with or expertise in determining the etiology of a medical condition. The Court agrees.

Dr. Smith is an experienced traumatologist and intensivist. He has been practicing in that capacity for his entire medical career, which spans approximately fifteen years. (Mot. in Lim. Ex. M, at 3-4, ECF No. 78-15); (Smith Dep. at 24:16-17). In his deposition, Dr. Smith described the role of a traumatologist and an intensivist. A traumatologist "does the initial stabilization" of a patient that has experienced trauma such as a car accident or gun shot. (Smith Dep. at 34:12). After a traumatologist stabilizes a trauma patient, the patient is transferred to an intensive care unit "where an intensivist will continue their care . . . and help with the rest of the life-saving process." (Id. at 34:17-20). An intensivist is a "physician who treats critically ill patients." (Id. at 30:4-7). Dr. Smith contends that his "training and experience allow [him] to practice excellent critical care in any medical or surgical environment." (Mot. in Lim. Ex. M at 1).

Given his background, there is little question that Dr. Smith would qualify in a medical malpractice case as an expert

on the standard of care for a traumatologist, intensivist, or emergency room physician in treating a critical care patient. Here, however, Dr. Smith offers opinions on the etiology of Anderson's injuries, and etiology has never been a part of Dr. Smith's practice.  When describing the basis for his opinions regarding the etiology of Anderson's injuries, Dr. Smith conceded that he has only "seen patients" and "take[n] care of patients" with injuries like Anderson's. (Smith Dep. at 43:12–13).  But, diagnosing and treating a condition are not the same as determining the cause of a condition.  See Clarke, 632 F.Supp.2d at 1358 ("[D]iagnosing a disease is not the same as determining the etiology of the disease.").  Moreover, Dr. Smith has no training or experience in forensic pathology.[7]  It is not surprising, then, that Dr. Smith has never been qualified as an expert on causation in a wrongful death case.  (Smith Dep. at 6:5–7).

Because Dr. Smith lacks "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, in etiology, the Court concludes he is not qualified as an expert to offer opinions on the etiology of Anderson's injuries.  See Clarke, 632 F.Supp.2d at 1356–60 (explaining that emergency room physician was not

---

[7] Forensic pathology "seeks through detailed examination of a decedent's body to reconstruct the cause and manner of death." United States v. Vega-Penarete, No. 91–5902, 1992 WL 212142, at *2 (4th Cir. 1992).

qualified as an expert on the etiology of decedent's deep vein thrombosis in wrongful death case because physician only diagnosed and treated this condition in his practice); Shreve, 166 F.Supp.2d at 393 (concluding that witness did not qualify as an expert on the safe design and operation of snow throwers because although witness was an "eminently qualified mechanical engineer and professor of mechanical engineering," he "had no professional experience with respect to the design, manufacture, operation, or safety of outdoor power equipment, including snow throwers"). Accordingly, the Court will grant the Officer's Motion and exclude any opinions from Dr. Smith on the etiology of Anderson's injuries.[8]

### ii.  The Officers Misled the Paramedics

Dr. Smith and Miller both opine that the Officers misled the paramedics by informing them that Anderson was suffering from a drug overdose rather than physical trauma. (Mot. in Lim.

---

[8]  In her expert report, Miller did not opine as to the etiology of Anderson's fatal injuries. Nevertheless, during her deposition, she testified that she "had a problem with" some of the conclusions of Dr. Jonathan Arden, the Officers' expert on medical causation. (Miller Dep. 170:21, July 27, 2015, ECF No. 78-19). She also opined as to what caused a soft tissue hemorrhage on Anderson's left temporal muscle. (Id. at 172:18-20). The Officers move to exclude any expert opinions from Miller on the etiology of Anderson's injuries because she is not qualified to offer those opinions. The Court finds that like Dr. Smith, Miller does not possess the requisite "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, to qualify as an expert in etiology. Accordingly, the Court will exclude any opinions from Miller on the etiology of Anderson's injuries.

Ex. N ["Dr. Smith Report"], at 4, ECF No. 78-16); (id. Ex. S ["Miller Report"], at 1, ECF No. 78-21).   The Officers argue these opinions should be excluded because they are not reliable. The Court agrees.

First, Plaintiffs opinions are not based on scientific or technical knowledge, which means they must be based on some specialized knowledge to be reliable expert opinions.   See Oglesby, 190 F.3d at 250.   Plaintiffs, however, do not demonstrate that Dr. Smith or Miller has any specialized knowledge on BPD training or protocols regarding how to assess the medical condition of an arrestee or relay information to paramedics.   As such, Dr. Smith's and Miller's opinions represent nothing more than their subjective beliefs.   Second, Dr. Smith and Miller both rely on the paramedics' "Prehospital Care Report," which states that the paramedics' "Primary Impression" was "Withdrawal/Overdose Drugs."   (Mot. in Lim. Ex. K, at 1, ECF No. 78-13).   Dr. Smith and Miller, however, ignore other facts in the record including that the very same report states that Anderson suffered a "[b]lunt" injury from a "fall[]," (id. at 2), and the Officers told the first paramedic on the scene that Anderson had been tackled, (McNulty Dep. 70:2-4, Oct. 9, 2015, ECF No. 78-11).   Thus, Dr. Smith's and Miller's opinions amount to little more than unsupported speculation. Third, Plaintiffs do not identify any principles or methods that

Dr. Smith and Miller applied when developing their opinions. The Court, therefore, finds that Dr. Smith's and Miller's opinions are not reliable.

The Court further finds that Dr. Smith's and Miller's opinions would not assist the trier of fact. Assuming, without finding, that the Officers' conclusion that Anderson was suffering from an overdose belies what the Officers actually knew about Anderson's condition when the paramedics arrived, a jury could rely on its everyday knowledge and experience to conclude that the Officers misled the paramedics. The Court must not allow Dr. Smith's and Miller's opinions that the Officers misled the paramedics to "supplant a jury's independent exercise of common sense." Kopf, 993 F.2d at 377 (quoting Scott, 789 F.2d at 1055).

Accordingly, because Dr. Smith's and Miller's opinions are not reliable and would not assist the trier of fact, the Court will grant the Officers' Motion and exclude Dr. Smith's and Miller's opinions that the Officers misled the paramedics.

### iii. Misleading the Paramedics Contributed to Anderson's Death

Dr. Smith and Miller both opine that by misleading the paramedics to believe Anderson was suffering from a drug overdose, the Officers contributed to Anderson's death because the medical personnel at JHH were not initially prepared to

23

treat Anderson as a trauma patient. (Dr. Smith Report at 4); (Miller Report at 1). Dr. Smith opines that had medical personnel at JHH known from the outset that Anderson was a trauma patient, "[a]n operating room would have been prepared and a surgical team immediately mobilized" and "Anderson would never have been taken to a triage area." (Dr. Smith Report at 4). Dr. Smith further opines that "there is a good chance that [Anderson's] life may very well have been saved with the appropriate information being given, the appropriate diagnosis being made, and the appropriate and expeditious treatment being administered." (Id. at 4—5). According to Miller, the alleged misinformation the Officers provided "delay[ed] accurate diagnosis of [Anderson's] medical emergency and consequently delay[ed] life saving interventions of which surgery was paramount." (Miller Report at 1).

The Officers argue the Court should exclude these opinions because they are not reliable and would not assist the trier of fact. The Court agrees.

First, Plaintiffs present no evidence that Dr. Smith and Miller relied on any scientific, technical, or other specialized knowledge regarding probability of death or chance of survival when an emergency room staff begins treating a trauma patient as an overdose patient. Second, Plaintiffs fail to show that Dr. Smith and Miller relied on any methodology whatsoever in

developing their opinions.  As such, the Court has no way of determining whether Dr. Smith and  Miller applied the same level of intellectual rigor as an expert in the area of determining chances of survival or whether their methodology or technique, assuming they actually applied one, is generally accepted. Third, neither Dr. Smith nor Miller identifies any empirical data, study, or literature that supports their opinions. Fourth, Dr. Smith and Miller opine that had JHH medical personnel immediately treated Anderson as a trauma patient as opposed to an overdose patient, he would have had a better chance of survival.  At bottom, Dr. Smith and Miller assert that earlier treatment is preferable to later treatment.  This opinion, however, would not assist the trier of fact because it is already within the common knowledge of the average juror. See McDowell v. Brown, 392 F.3d 1283, 1299-300 (11th Cir. 2004) (concluding that district court properly excluded expert's testimony because his "the earlier, the better" theory was "well within common knowledge that would be obvious to the average juror").

Thus, the Court concludes that Dr. Smith's and Miller's opinions that misleading the paramedics contributed to Anderson's death are not reliable and would not assist the trier

of fact. Accordingly, the Court will grant the Officers' Motion and exclude these opinions.[9]

## C. __Motions for Summary Judgment__

### 1. __Standard of Review__

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Once a motion for summary judgment is properly made and supported, the nonmovant has the burden of showing that a genuine dispute of material fact

---

[9] In their Opposition to Motion in Limine (ECF No. 85), Plaintiffs request that the Court strike several documents the Officers reference in their Motion in Limine, arguing they contain inadmissible hearsay. Because the Court did not rely on any of these documents in ruling on the Motion in Limine, the Court will deny Plaintiffs' request as moot.

exists.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

A "material fact" is one that might affect the outcome of a party's case.   Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).   Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.   A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

Additionally, when a party moves for partial summary judgment, the Court "may enter an order stating any material fact . . . that is not genuinely in dispute and treat that fact as established in the case."   Fed.R.Civ.P. 56(g).

27

### 2. Analysis

#### i. Officers' Motions for Partial Summary Judgment on Alleged Kicking and Any Claim for Alleged Deprivation of Medical Care[10]

To prevail on their claims for constitutional torts, Plaintiffs must demonstrate that there was an affirmative causal link between the Officers' breach of their constitutional duties and Anderson's death. Slakan v. Porter, 737 F.2d 368, 376 (4th Cir. 1984) (citing Rizzo v. Goode, 423 U.S. 362 (1976)). This causal link "is analogous to proximate cause." Shaw v. Stroud, 13 F.3d 791, 800 (4th Cir. 1994). The Court looks to state law to determine what is required to show proximate cause. See Watson v. Adams, No. 4:12-CV-03436-BHH, 2015 WL 1486869, at *5 (D.S.C. Mar. 31, 2015) (quoting Barnes v. Anderson, 202 F.3d 150, 158 (2d Cir. 1999)).

Under Maryland law, to establish that the defendant's tortious conduct was the proximate cause of the plaintiff's injuries, the plaintiff must show a "reasonable connection" between the conduct and the injuries. Wash. Metro. Area Transit Auth. v. Reading, 674 A.2d 44, 52 (Md.Ct.Spec.App.1996). A reasonable connection exists when "'there is a complete

---

[10] Although the Court will deny Plaintiffs' Motion for leave to add allegations to their Complaint supporting a claim for deprivation of medical care, the Court will resolve the Officers' Motion for Summary Judgment on Any Claim for Alleged Deprivation of Medical Care in the event that at trial Plaintiffs attempt to raise a claim for deprivation of medical care.

continuance and unbroken sequence between the act complained of and the act finally resulting in the injury [or death], so that one may be regarded by persons of ordinary judgment as the logical and probable cause' of the injury." Osunde v. Lewis, 281 F.R.D. 250, 260-61 (D.Md. 2012) (quoting Vito v. Sargis & Jones, Ltd., 672 A.2d 129, 139 (Md.Ct.Spec.App. 1996)). Furthermore, when determining proximate causation involves complicated issues of medical causation, expert testimony is required to prove causation. Id. at 261; accord Giant Food, Inc. v. Booker, 831 A.2d 481, 488 (Md.Ct.Spec.App. 2003).

Here, Dr. Smith and Miller are the only witnesses who opine that kicking Anderson while he was under arrest and depriving him of medical care by misleading the paramedics caused Anderson's ruptured spleen and eventual death. As the Court concluded above, however, Dr. Smith's and Miller's opinions are inadmissible as a matter of law. Plaintiffs fail to present any other expert testimony regarding causation. The Court, therefore, will grant the Officers' Motions for Partial Summary Judgment.

### ii.  Plaintiffs' Motion for Summary Judgment[11]

---

[11]  Because the Court has already concluded that it will grant the Officers' Motions for Partial Summary Judgment on Alleged Kicking and Any Claim for Deprivation of Medical Care, the Court will only review Plaintiffs' Motion for Summary Judgment as it pertains to the Takedown.

Plaintiffs argue they are entitled to judgment as a matter of law that the Takedown was an excessive use of force and the Officers are not entitled to qualified immunity. Claims for excessive use of force during an arrest are analyzed under the Fourth Amendment.[12] Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989). The Court applies a standard of objective reasonableness, under which "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. When applying this standard, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

---

[12]  Plaintiffs assert that the Officers' use of force in arresting Anderson violated both the Fourth Amendment and Article 26 of the Maryland Declaration of Rights. These provisions are construed in pari materia. Dent v. Montgomery Cty. Police Dep't, 745 F.Supp.2d 648, 661 (D.Md. 2010) (citing Richardson v. McGriff, 762 A.2d 48, 56 (Md. 2000)). As such, the Court will not separately review whether the Officers' use of force violated Article 26. See id. at 661-62 (explaining that because the Fourth Amendment and Article 26 are construed in pari materia, "the disposition of Plaintiff's § 1983 claim under the Fourth Amendment 'dictates the same result on her Article 26 claim'" (quoting Mazuz v. Maryland, 442 F.3d 217, 231 (4th Cir. 2006)).

flight." Id. at 396. The Court may also consider the extent of the plaintiff's injuries. See Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). But, this factor is not alone dispositive of whether an excessive use of force has occurred. See id. at 527–28 ("The 'question is whether the totality of the circumstances justified a particular sort of . . . seizure.'" (quoting Tennessee v. Garner, 471 U.S. 1, 8–9 (1985))).

Though the Court examines uses of force that have already occurred, the Court must focus "on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Greenidge v. Ruffin, 927 F.2d 789, 791–92 (4th Cir. 1991)). Indeed, the Court "may not employ 'the 20/20 vision of hindsight,'" but rather "must make 'allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving.'" Id. (quoting Graham, 490 U.S. at 396–97).

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Court considers two inquiries when determining whether a

government official is entitled to qualified immunity: (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right," Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001); and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct," id. (quoting Saucier, 533 U.S. at 201). The Court has discretion to determine which of these inquiries to address first. Id. at 236. The answer to both of these inquiries, however, must be in the affirmative for a plaintiff to prove a defendant is not entitled to qualified immunity. See Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (quoting Batten v. Gomez, 324 F.3d 288, 293-94 (4th Cir. 2003)). Thus, if the Court elects to first consider whether the plaintiff has shown a violation of a constitutional right and the Court determines he has not, the defendant "is hardly in need of any immunity and the analysis ends right then and there." Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007).

Plaintiffs present the testimony of several eyewitnesses to the Takedown. Keith Johnson maintains that Anderson did not engage in a CDS transaction outside the liquor store, but rather obtained a loose cigarette from a neighborhood acquaintance. (Johnson Dep. 12:6-12, Feb. 16, 2015, ECF No. 77-9). Johnson testified that he alerted Anderson to the presence of the

police, at which point Johnson and Anderson walked away from the liquor store in separate directions. (Id. at 12:13-20). After a police vehicle pulled up alongside Anderson, an officer jumped out of the back of the vehicle and ran behind Anderson without identifying himself or saying anything. (Id. at 12:20-13:3). The officer then "grabbed Mr. Anderson in a bear hug and he slammed him on the ground. (Id. at 13:3-5). Johnson stated that the officer lifted Anderson almost two feet off the ground before slamming him down. (Id. at 31:20-32:1). Johnson also testified that Anderson "hit [the ground] pretty hard," with his head contacting the ground first, (id. at 32:2-10), and the officer executing the Takedown fell on top of Anderson with most of the officer's weight, (id. at 32:21-33:2).

Officer Strohman acknowledges that he was the officer that executed the Takedown. He, however, offers an utterly different account of the Takedown and the events that precipitated it. According to Strohman, the Officers were patrolling an area in East Baltimore when they saw Anderson "involved in a drug transaction." (Strohman Dep. at 44:2-4). When Anderson noticed the patrol vehicle, he began walking away toward a vacant lot. (Id. at 44:4-7). As the Officers pulled their patrol vehicle near the vacant lot to pursue Anderson, Officer Strohman identified himself as a police officer and ordered Anderson to stop, but Anderson continued walking away. (Id. at 50:13-15,

51:8-10).  Officer Strohman then exited the patrol vehicle and again identified himself as a police officer and ordered Anderson to stop.  (Id. at 44:8, 50:15-16).  This time, while still continuing to walk away from Officer Strohman, Anderson "briefly turned around, and then he reached in his pocket, retrieved a plastic bag containing suspected narcotics and started to ingest them."  (Id. at 44:8-11, 51:8-10, 52:21-53:4). At that point, Officer Strohman "came up from behind [Anderson]" and "kind of bear hugged him from behind over top of his arms to prevent him from ingesting the drugs."  (Id. at 44:12-14). After Anderson "briefly struggled by just widening his stance," Officer Strohman "leaned back to get him off balance, and [they] both fell to the side."  (Id. at 44:15-17).  Officer Strohman testified that he lifted Anderson only two-to-three inches off the ground before he and Anderson fell to the ground.  (Id. at 58:12-14).  He also testified that he did not fall directly on top of Anderson.  (Id. at 58:18-19).

The parties present conflicting opinions from their use-of-force experts.  According to Plaintiffs' expert, Dr. Tyrone Powers, the Takedown "would be excessive under any scenario, whether it was to stop [Anderson] from distributing drugs, which he wasn't doing at the time, or whether it was to keep [Anderson] from further harming himself."  (Powers Dep., 30:14-18, June 19, 2015, ECF No. 77-16).  Dr. Powers also testified

that the Takedown was excessive because officers are not trained to drive an arrestee into the ground when the arrestee is already under control.   (Id. at 29:14–17).

Not surprisingly, the Officers' expert, Charles J. Key, Sr. offers the opposite opinion.  According to Key, the Takedown was objectively reasonable because Officer Strohman had probable cause to believe Anderson was engaging in the felony crime of distribution of narcotics and Anderson defied Officer Strohman's repeated orders to "stop" by walking away, attempted to swallow narcotics, and actively resisted Officer Strohman by spreading his legs when grabbed.  (Defs.' Opp'n to Pls.' Mot. Summ. J. Ex. 1, at 13–19, ECF No. 84-1).   Key also asserted that it was objectively reasonable for Officer Strohman to consider Anderson a serious threat to the Officers' safety because BPD officers are "trained that drugs and guns go together and that they should consider any person who they have probable cause to believe is selling drugs to be armed until that person is handcuffed and searched."  (Id. at 16–18).

In sum, the facts and circumstances of the Takedown, including the severity of Anderson's crime and whether Anderson posed an immediate threat to the safety of the Officers or actively resisted or evaded arrest, are disputed.  Viewing the facts and circumstances of the Takedown in the light most favorable to the Officers, Officer Strohman restrained Anderson

in a bear hug and lifted Anderson a couple inches off the ground to get Anderson off balance before the two fell to ground without Anderson landing directly on top of Anderson.   The Takedown occurred after Anderson engaged in a criminal narcotics transaction, ignored two orders to cease walking away from the police, began ingesting suspected narcotics, and resisted arrest by spreading his legs when Officer Strohman grabbed him from behind.   The Court finds that a reasonable jury examining these facts could find that the Takedown was not an excessive use of force under the circumstances.

Thus, there is a genuine dispute of material fact and Plaintiffs are not entitled to judgment as a matter of law that the Takedown was an excessive use of force.   As such, Plaintiffs are also not entitled to judgment as a matter of law that the Officers are not protected by qualified immunity.   See Abney v. Coe, 493 F.3d at 415.   Accordingly, the Court will deny Plaintiffs' Motion as to their claims for excessive use of force and common law battery.[13]   See Rowland v. Perry, 41 F.3d 167, 174

---

[13] Plaintiffs also contend that Officer Vodarick is liable on a theory of bystander liability for Strohman's excessive use of force during the Takedown.   Because the Court has already concluded that there is a dispute regarding the legality of the Takedown, the Court need not explore whether Officer Vodarick is liable for excessive use of force.   Nonetheless, even assuming, without finding, the Takedown was an excessive use of force, Plaintiffs have not demonstrated that the elements for bystander liability are satisfied.   "To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement

(4th Cir. 1994) (explaining that a state law claim for battery is subsumed within a federal claim for excessive use of force).

## III. CONCLUSION

For the foregoing reasons, the Court will GRANT in part and DENY in part Plaintiffs' Motion for Leave to Amend Complaint (ECF No. 91) and DENY Plaintiffs' Motion for Summary Judgment (ECF No. 77).   The Court will direct the Clerk to substitute Shayner Anderson for Edith Fletcher as the personal representative of Anderson's estate.   The Court will also GRANT the Officers' Motion in Limine to Exclude Certain Opinions of Plaintiffs' Medical Experts (ECF No. 78) and Motions for Partial Summary Judgment on the Issue of Whether Alleged Kicking Contributed to the Death of Anthony Anderson (ECF No. 79) and on Any Claim for Alleged Deprivation of Medical Care (ECF No. 80). A separate Order follows.

Entered this 27th day of July 2016

/s/

_____
George L. Russell, III
United States District Judge

---

officer '(1) [knew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act.'" Stevenson v. City of Seat Pleasant, 743 F.3d 411, 417 (4th Cir. 2014) (alterations in original) (quoting Randall v. Prince George's Cty., 302 F.3d 188, 203 (4th Cir. 2002)).   Plaintiffs present no evidence to satisfy any of these elements.